Filed 12/10/21  Loeffler v. Trabuco Highlands Community Assn. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JENNIFER LOEFFLER, | |
| Plaintiff and Appellant, | G059087 |
| v. | (Super. Ct. No. 30-2016-00873201) |
| TRABUCO HIGHLANDS COMMUNITY ASSOCIATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Theodore R. Howard, Judge.  Affirmed.

Steven Lewis Rader for Plaintiff and Appellant.

Kulik Gottesman Siegel & Ware, Leonard Siegel, Mitchell S. Brachman, and Thomas Ware; Richardson Ober Denicholo and Daniel A. Nordberg for Defendant and Respondent.

In this dispute between a homeowner and her homeowner's association, Jennifer Loeffler appeals from the trial court's grant of summary adjudication in favor of Trabuco Highlands Community Association (Association) on her claims for quiet title and slander of title. She also asserts the court erred by entering judgment for Association after a bench trial on her claim of violation of the covenants, conditions, and restrictions (CC&Rs), and by granting judgment in favor of Association on its cross-complaint seeking unpaid assessments. We find no error and affirm the judgment.

FACTS

I. *Background Facts*

Association's CC&Rs were recorded in 1987 by the original developer of 21 lots and provided for annexable territory in the future. A few years later, in a second phase of development, additional territory was annexed. Because the second phase of development caused increased common area expenses for the new annexation, the method of calculating assessments for the annexed properties could result in a different amount of assessment as compared to the first phase.

Additional annexations occurred over several years until about 1995. At that point, Association included 811 properties divided into five different territories, referred to as "product lines." The product lines were known as Homestead/Crossing, Ridge, Springs, Promontory, and Newcrest Estates. Each product line contained a different amount of Association-maintained landscaped slopes, fire abatement zones, and common area amenities like walls, fences, drainage structures, irrigation lines, etc. Because of the varying amenities, the supplemental CC&Rs that accompanied each annexation phase included provisions recognizing that assessments for each product line would be based, in part, on the benefits new owners would receive and the extra cost the new product line would have on Association. In 1998, the assessment amounts varied from $64.80 per month per lot for the first phase, to $160 per month per lot for Promontory.

2

In early 1999, Association formed an assessment review committee to ensure assessments properly reflected the varying values of the common area services provided to each product line. Ultimately, Association's board of directors adopted a new formula for the computation of annual assessments reflecting the proportionate share of the common area services that leveled out the variance among the product lines. In connection with committee's work, Association's attorney confirmed the assessment methodology it was following was in conformity with the CC&R's. Members received updates on the varying annual assessments among these product lines.

In December 2012, Association annexed the sixth and final product line, known as Vista/Fieldstone (Vista), consisting of eight lots in Tract 16677. Utilizing the same methodology used since 1999, Association estimated the variable components of Vista and found the assessment would be higher than any of the other product lines, so it reduced the amount to be equal with that of the then highest assessed product line, Promontory at $166 per month per lot.

In January 2013, Loeffler purchased one of the Vista lots. Her grant deed was recorded in March 2013. Loeffler was informed of the monthly assessments, that she was responsible for $166 per month at the time of purchase, and that the dues at that time ranged from $104-$166 per month depending on the product line or community a home was located in.

II. *Operative Pleadings*

In May 2014, Loeffler stopped paying her assessments and then filed a preemptive lawsuit against Association. In her operative complaint, Loeffler alleged the following claims: (1) quiet title; (2) declaratory relief seeking determination of her rights to her property; (3) breach of CC&Rs; (4) nuisance; (5) invasion of privacy; (6) slander of title; (7) defamation; (8) and fraud. Claims 4 and 5 were not alleged against Association and were dismissed before trial. Association brought an anti-SLAPP motion to strike claims 7 and 8, which the court granted. Accordingly, our concern on appeal is

3

limited to claims 1 and 6, which were dismissed via summary adjudication, and 2 and 3, which went to trial.

Specifically, Loeffler sought to quiet her property title and several liens recorded against her property by Association for nonpayment of assessments. She alleged her property was not within the legally described "'[a]nnexable territory'" and annexation of her tract was not approved "by vote or written consent of Members entitled to exercise no less than two-thirds (2/3rds) of the voting power of [Association's' current members at the time of annexation." (Italics and bold omitted.) She asserted Association's recordation of the notice of addition and liens slandered her property title. Loeffler also disputed the validity of the assessment liens recorded by Association and alleged it violated the declaration by imposing and attempting to collect regular assessments "substantially greater in amount than the regular assessments imposed and collected from other Lots and/or Owners within the common interest development."

Association filed a cross-complaint against Loeffler for recovery of the unpaid assessments, late charges, and interest. Among other things, the action sought to enforce the CC&Rs provisions requiring Loeffler to pay assessments, which she stopped doing in 2014.

III. *Protective Order*

Association moved for protective orders regarding production of election ballots and voter tally, as well as to protect production of its membership list. The trial court granted the motions and required production of only redacted versions of the ballots and the voter tally.

IV. *Summary Adjudication*

In July 2018, the parties filed cross-motions for summary judgment or, in the alternative, summary adjudication of issues. Only Association's motion is at issue on appeal.

4

Ultimately, the trial court ruled in favor of Association, determining there was no triable issue that "Tract 16677 [the location of Loeffler's property] was annexed into the Association upon approval by a vote or written consent of members entitled to no less than 2/3rds of the voting power of the Association." (Italics omitted.) It further decided "the first cause of action for quiet title fails . . . because [Loeffler] is time-barred from challenging an election or vote that occurred over eight years before she filed suit." (Italics omitted.) The court also granted summary adjudication on Loeffler's sixth cause of action for slander of title "because the claim is barred by the statute of limitations and the litigation privilege." (Italics omitted.)

V. *Trial*

At trial in September 2019, all that remained from Loeffler's operative complaint were the claims for injunctive relief contained in claims 2 and 3. They involved two issues: assessment amounts and Association's alleged failure to enforce the CC&Rs/architectural guidelines.

As to the assessment issue, Association provided testimony that members were assessed a fixed amount for the costs related to the use of the clubhouse, for taxes, insurance and other costs which are the same for all members. Association also assessed a variable amount tied to the landscaping and water use and other utility usage in each separate product line. Evidence at trial showed Loeffler signed her purchase documents acknowledging the monthly assessment.

Testimony also showed Association empaneled an assessment review committee to prepare a formula to ensure the fixed and variable amounts were fairly and properly allocated. This analysis was performed in 1999 and put into effect in late 1999. It remained the utilized method for another 13 years before Loeffler ever purchased her property and for 16 years before she first raised her theory of unfair assessments.

The evidence established that Loeffler stopped paying her assessments in May 2014. Association gave monthly notice to Loeffler of the assessments and any late

5

charges or interest. In August 2014, Association gave Loeffler written notice of an increase in assessments to $180 per month, starting in October of that year. Despite written notices and demands for payment, Loeffler failed to pay the money she owed Association.

The trial court determined the only credible reason Loeffler stopped paying her assessments was because of her dissatisfaction with Association's handling of alleged landscaping and architectural violations by her neighbors. It also found Loeffler's testimony as to other reasons for not paying her assessments not credible.

The court's statement of decision determined: "the Court finds that the [Association] has consistently assessed its dues according to the benefit Owner/members receive in each phase (or product line). . . . In determining the amount of assessments to be paid by the Owner/members, the [Association] calculates the cost per square footage of Association maintained landscaped slopes, fire abatement zones, and common area amenities. [Association] then equally and uniformly applies these square footage costs equally and uniformly to the actual square footage of Association maintained landscaped slopes, fire abatement zones, and common area amenities in each product line. This formula is applied equally and uniformly to assess assessments upon all Owners in each product line, including [Loeffler's]. Thus, while the amount paid by each Owner/member may vary depending upon which product line the property is located in, the same method or means are applied impartially to all Owner/members so as to operate equally and uniformly upon all Owners in each product line throughout [Association]."

The trial court further opined, "Central to both of these causes of action is [Loeffler's] claim that [s]ection 6.06 of the CC&Rs requires that all assessments 'shall be assessed equally and uniformly against all Owners and their Lots.' [Loeffler] urges this language means that the assessment *amounts* on all lots and owners must be in an equal amount. [Association] asserts that this language mandates that the *methods* of assessing each lot must be done in an equal and uniform manner for reasons set forth in governing

6

documents, and it has been.  The Court agrees with [Association].  The Court further determined Association fairly enforced the architectural guidelines, pursuant to the principles of the CC&Rs and the Civil Code, and a proper good faith exercise of the discretion afforded to its board of directors."  The trial court entered judgment in favor of Association on both the operative complaint and the cross-complaint and against Loeffler.

DISCUSSION

Loeffler asserts the trial court erred by granting summary adjudication in Association's favor on claims 1 and 6.  She also alleges the court improperly granted Association judgment after trial on her claims 2 and 3, and it incorrectly granted judgment to Association on its cross-complaint.  Her contentions lack merit.

I. *Summary Adjudication*

The trial court granted summary adjudication on claims 1 and 6 because they were barred by the applicable statutes of limitation.  We agree with the trial court. We review an order granting a motion for summary adjudication de novo.  (*Quidel Corp. v. Superior Court* (2020) 57 Cal.App.5th 155, 164.)

In reaching its decision, the trial court explained, "[T]he first cause of action for quiet title fails as to the moving defendant because plaintiff is time-barred from challenging an election or vote that occurred over eight years before she filed suit." (Italics omitted.)  The applicable statute is one year from the time of the vote under Civil Code section 5145.[1]  It is uncontested the vote occurred in 2007 and this action was filed in 2016, well after the statute had run.  Loeffler's attempt at avoiding the limitation requirements by looking only to the title of the cause of action is improper.  "[T]he allegations in the body of the complaint, not the caption, constitute the cause of action

---

[1]  All further statutory references are to the Civil Code, unless otherwise indicated.

against the defendant. [Citation.]" (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 418.)

The gravamen of the assertions in the quiet title claim is the 2007 annexation vote was not properly conducted and the recordation of the notice of addition was fraudulently recorded or there were knowing misrepresentations of true facts. Loeffler asserts she did not seek an election challenge under section 5145, however, the sole basis for the allegation is a challenge to the results of the vote. Such analysis of the propriety of the election is limited to one year.

Similarly, the trial court determined Association was "entitled to summary adjudication as to the sixth cause of action for slander of title because the claim is barred by the statute of limitation and the litigation privilege." (Italics omitted.) Loeffler's slander of title claim was barred by the three-year statute of limitations under Code of Civil Procedure section 338, subsection (g). The notice of addition was recorded on December 31, 2012, and the CC&Rs in 1987. Thus, the latest date Loeffler could have brought an action for slander of title was December 31, 2015. Loeffler did not file her complaint until September 2, 2016. Loeffler's claim for slander of title based on the recordation of the CC&Rs and notice of addition was barred by the three-year statute of limitations and summary adjudication was appropriate.

We conclude the trial court properly granted summary adjudication in Association's favor as to claims 1 and 6 because they were time barred. Because we affirm that determination, we need not reach Loeffler's arguments on the merits as to whether the election was properly conducted, whether the court abused its discretion in issuing a protecting order, or whether any triable issue of material fact exists as to the election results.

II. *Breach of the CC&Rs Claim Against Association*

Loeffler contends the trial court erred as a matter of law in its interpretation of section 6.06 of the CC&Rs regarding assessments. Specifically, she urges this section

8

means assessments must be equal and uniform against all owners and their lots. Her interpretation is flawed.

Generally, as here, "assessed equally and uniformly" requires that the means of computation of the assessments are applied equally and uniformly to all owners in Association. Courts determine if assessments operate equally and uniformly upon all persons in similar circumstances, and impartially as to all persons in similar circumstances. (See *Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, 438-439.) This rule of equality requires the same means and methods to be applied impartially to all the constituents of each class so that the law shall operate equally and uniformly upon all persons in similar circumstances. (*W.C. Peacock & Co. v. Pratt* (9th Cir. 1903) 121 F. 772, 776.)

Section 6.06 of the CC&Rs provides as follows: "Annual Assessments, Capital Improvement Assessments and Reconstruction Assessments provided for in this Article VI shall be assessed equally and uniformly against all Owners and their Lots. The Association may . . . levy Special Assessments against selected Owners who have caused the Association to incur special expenses due to willful or negligent acts of said Owners, their tenants, families, guests, invitees or agents. All installments of Annual Assessments shall be collected in advance on a regular basis by the Board of Directors, at such frequency as the Board shall determine from time to time."

Association satisfied the requirements made plain by the CC&Rs. It made a careful determination of the benefits provided by Association-maintained landscaped slopes, fire abatement zones, and common area amenities particular to each property and applied a cost per square foot methodology. Aside from a tortured reading of the CC&Rs to require all assessments be the same dollar amount, Loeffler provides no evidence Association's methodology in calculating assessments was unequal.

Loeffler's assertion section 6.06 of the CC&Rs requires Association to impose the exact amount of assessments for each property is incorrect. Instead, the

9

CC&Rs require assessments at a uniform and equal rate, utilizing the methodology she acknowledged at the time of her purchase. The evidence showed Association's rate for computation had always been imposed equally and uniformly pursuant to the formula adopted by the assessment committee. The trial court properly determined Association did not violate the CC&Rs.

IV. *Judgment on Association's Cross-Complaint*

Loeffler contends that although Association's cross-complaint alleged common counts of account stated and open book account, Association only proved her "breach of the CC&Rs" at trial. Specifically, she asserts each common count lacked the necessary element of agreement and the trial court's statement of decision failed to address this issue over her objection. We disagree.

As an initial matter, a trial court was only required to set out ultimate findings rather than evidentiary ones in its statement of decision. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 560.) If the statement of decision sufficiently disposes all basic issues in a case, the trial court need not make express factual findings on every controverted issue at trial. Loeffler asserts the court improperly failed to address the following objection to the statement of decision: "On its cross-complaint did [Association] carry its burden to prove every element of its causes of action for Account Stated and Open Book Account?"

The court, however, directly addressed this issue, stating Association "carried its burden at trial to prove by a preponderance of the evidence, every element of its action against . . . Loeffler for recovery of the unpaid assessments, late charges, interest, etc. [¶] . . . Loeffler failed to carry her burden to prove by a preponderance of evidence, each and every element of the affirmative defenses asserted in her answer to [Association's] cross-complaint. [¶] [Association's] action to recover assessments, late charges, interest, and costs of collection against . . . Loeffler was reasonable, timely, and proper." The statement of decision properly addressed the issue. We next turn to the

10

underlying merits, which we review for substantial evidence. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581.)

"An account stated is an agreement, based on prior transactions between the parties, that all items of the account are true and that the balance struck is due and owing from one party to the other. [Citations.]" (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 25.) The agreement may be oral, in writing, or implied from the parties' words and conduct. (*Ibid.*) "The essential elements of an account stated are: (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due. [Citations.]" (*Zinn v. Fred R. Bright Co.* (1969) 271 Cal.App.2d 597, 600.)

Loeffler's agreement to pay the balance due was implied from circumstances. Her assertion there was no agreement between the parties is both belied by the record and immaterial where the agreement may be implied by the circumstances. The underlying financial obligation of Loeffler to pay assessments was set forth in the CC&Rs, notice of addition, and the Civil Code. At the time Loeffler signed her purchase documents in January 2013, she acknowledged receipt of the CC&Rs and the California Department of Real Estate (DRE) Public Report which advised her of a then current monthly assessment of $166. The DRE Public Report also informed Loeffler that other properties in Association would be charged different monthly assessments depending on their product line.

The evidence showed proper assessments were made by Association against Loeffler and her property from the date Loeffler took title to her lot and continuing to trial. Association gave monthly notice to Loeffler of the assessments against her lot, as well as late charges, interest, etc. Loeffler continuously paid her assessments until May 30, 2014. Loeffler's stated reason for stopping payments was anger over her perceived lack of enforcement of the CC&Rs against her neighbors, not

11

that she disagreed with the balance stated. Loeffler had no legal right to withhold payment of assessments because of a dispute with her neighbors. (See *Park Place Estates Homeowners Assn. v. Naber* (1994) 29 Cal.App.4th 427, 432.)

In August 2014, Association gave written notice to Loeffler of the increase of monthly assessments for her lot to $180 a month, starting October 1, 2014, and included a copy of Association's delinquency policy with the notice. Association mailed notices of subsequent increases in the monthly assessments to Loeffler. Association carried its burden of proving, by a preponderance of the evidence, each and every element of the account stated.

A book account is a written record of the credits and debts between parties to a contract, or in a fiduciary relationship. The contract may be oral, in writing, or implied by the parties' words and conduct. A book account is "open" if entries can be added to it from time to time. "The elements of an open book account cause of action are: '1. That [plaintiff] and [defendant] had financial transactions . . . ; [¶] 2. That [plaintiff] . . . kept [an] account of the debits and credits involved in the transactions; [¶] 3. That [defendant] owes [plaintiff] money on the account; and [¶] 4. The amount of money that [defendant] owes [plaintiff].' [Citation.]" (*State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 449.)

At trial, the evidence showed Association and Loeffler had financial transactions with each other in the form of monthly assessment payments. Association, in the regular course of business, kept an account of the debits and credits involved in the transactions. Those financial documents demonstrated Loeffler owed Association money, the delinquent assessments, on the account. They also specified the amount of money owed. Therefore, evidence established Association carried its burden of proving by a preponderance of evidence each and every element of an open book account.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.